*Baltimore Police Department, et al. v. Open Justice Baltimore*, No. 20, September Term, 2022. Opinion by Biran, J.

**STATUTORY INTERPRETATION – MARYLAND PUBLIC INFORMATION ACT – WAIVER OF FEES –** The Maryland Public Information Act (the "MPIA") permits an agency records custodian to charge a reasonable fee for compliance with a request to disclose public records. The MPIA also permits the custodian to waive fees, in whole or in part, if the custodian determines that a waiver would be in the public interest. Md. Code Ann., General Provisions ("GP") § 4-206(e)(2)(ii). The Supreme Court of Maryland held that the MPIA vests custodians with discretion to determine which factors (in addition to an applicant's ability to pay the fee and whether the public would benefit from disclosure of the requested records) are relevant to the determination of whether a fee waiver would be in the public interest. Custodians also have discretion to determine whether the waiver would be in the public interest after considering all relevant factors, which may include the monetary cost of compliance to the agency as well as the burden on agency personnel. If a custodian concludes that a waiver in whole or in part of a fee would be in the public interest, the custodian does not have discretion to deny such a waiver.

**APPELLATE REVIEW – DENIAL OF FEE WAIVER UNDER THE MPIA –** The Supreme Court held that an agency custodian's denial of a request for a fee waiver is reviewed under the arbitrary and capricious standard.

**MPIA – DENIAL OF FEE WAIVER – ARBITRARY AND CAPRICIOUS REVIEW –** The Supreme Court held that Petitioner, Baltimore Police Department ("BPD"), arbitrarily and capriciously denied the request for a fee waiver made by Respondent, Open Justice Baltimore ("OJB"). BPD's custodian misapplied certain factors in its analysis and failed to consider other factors: whether disclosure of the records in question would shed light on a public controversy; and whether a complete denial of a fee waiver would exacerbate the controversy.

**APPELLATE REVIEW – ARBITRARY AND CAPRICIOUS AGENCY ACTION – REMEDY –** The Supreme Court held that the proper remedy in light of the custodian's errors in making the public interest determination under GP § 4-206(e)(2)(ii) was a remand to BPD for reconsideration of that determination, properly applying all relevant factors.

IN THE SUPREME COURT

OF MARYLAND*

No. 20

September Term, 2022

BALTIMORE POLICE DEPARTMENT, ET AL.

v.

OPEN JUSTICE BALTIMORE

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.

Opinion by Biran, J.

Filed: August 31, 2023

\* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

For more than 40 years, the Maryland Public Information Act (the "MPIA" or the "Act") has allowed records custodians, in certain circumstances, to grant requests for waivers of fees to search for, prepare, and produce records sought under the Act. The current version of the MPIA's fee waiver provision states, in part, that an official custodian may grant a requested fee waiver if, "after consideration of the ability of the applicant to pay the fee and other relevant factors, the official custodian determines that the waiver would be in the public interest." Md. Code Ann., General Provisions ("GP") § 4-206(e) (2019 Repl. Vol.). This is the first case in which this Court has considered a challenge to a custodian's denial of a request for such a fee waiver.

Respondent, Open Justice Baltimore ("OJB"), is an organization interested in investigating and publicizing reports of police misconduct. In late 2019 and early 2020, OJB filed several requests under the MPIA with the Baltimore Police Department ("BPD"), seeking records relating to citizen and administrative complaints of police misconduct, as well as department-initiated investigations of police misconduct by BPD's Special Investigation Response Team ("SIRT") and of other incidents involving uses of force. This appeal concerns OJB's requests for production of certain closed files relating to SIRT investigations and other use of force investigations. BPD provided an estimate to OJB that quoted a cost of more than $245,000 to produce 2,337 such files. OJB asked BPD to waive the fees to produce them. OJB asserted that a fee waiver would be in the public interest because the disclosure of the records would promote transparency and increase trust between Baltimore citizens and BPD. OJB also told BPD that it was "a program of a non-

profit organization" and had been "deemed a public interest organization, classified tax-exempt, not generating any beneficiary income."

OJB refused to narrow its request to lessen the costs of compliance and insisted that BPD waive the entire fee. BPD had questions about how OJB intended to disseminate the requested records to the public and whether the public would be able to understand the records with the redactions that would be necessary. These and other concerns led BPD to conclude that a fee waiver would not be in the public interest. BPD denied the fee waiver request in its entirety. However, before doing so, BPD did not share its specific concerns with OJB and give OJB the opportunity to attempt to address them.

OJB sought judicial review of BPD's denial of the requested fee waiver in the Circuit Court for Baltimore City. Seeking summary judgment, BPD and then-BPD Police Commissioner Michael Harrison (collectively, "BPD")[1] submitted an affidavit from the official who decided to deny the fee waiver. That official attested that, after careful consideration of OJB's request, he had determined that disclosure of the investigation records would not aid the public in understanding what BPD was doing to address its problems concerning police misconduct. Among other things, he concluded that, given the resources already publicly available that explain BPD's efforts to improve its practices under a federally monitored consent decree, requiring Baltimore City taxpayers to pay the

---

[1] OJB initially named BPD, the City of Baltimore, and Commissioner Harrison (in his official capacity) as defendants in the Complaint. The parties subsequently filed a stipulation dismissing the City of Baltimore as a party in the case. BPD and Commissioner Harrison jointly filed the petition for *certiorari* that we granted in this case. Commissioner Harrison resigned his position as Commissioner of BPD in June 2023.

2

costs associated with providing the closed investigation files to OJB would not be in the public interest.

The circuit court upheld the denial of the fee waiver, determining that BPD's decision was not arbitrary or capricious. OJB appealed to the Appellate Court of Maryland (at the time, called the Court of Special Appeals of Maryland),[2] which reversed the circuit court's ruling. The Appellate Court concluded that BPD failed to meaningfully consider whether disclosure of the closed investigation files would aid the public's understanding of how BPD was addressing allegations of police misconduct. Thus, the Appellate Court determined, BPD's denial of the requested fee waiver was arbitrary and capricious. BPD sought further review of the Appellate Court's judgment in this Court.

The MPIA vests official custodians with broad discretion in determining whether a requested fee waiver is in the public interest. Custodians have discretion to decide which factors in a particular case are relevant to the public interest determination (in addition to the applicant's ability to pay the fee). Custodians also have discretion to decide whether the application of all relevant factors demonstrates that a fee waiver would be in the public interest in a particular case. However, while an official custodian's discretion in these matters is broad, it is not boundless. As we explain below, in this case BPD's fee waiver denial was arbitrary and capricious because BPD failed to meaningfully consider all relevant factors in deciding whether to grant OJB's requested fee waiver. In particular,

---

[2] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

BPD failed to meaningfully consider: (1) whether the fee waiver would further the public interest by shedding light on the public controversy concerning BPD's failure to properly investigate officer misconduct; and (2) whether completely denying the fee waiver would exacerbate that public controversy by contributing to the appearance of a lack of transparency. We will order a remand to BPD to reconsider OJB's requested fee waiver in light of these and all other relevant factors, which include OJB's ability to pay the quoted fees and the cost to, and burden on, BPD to comply with OJB's requests.

# I

## Background

We first provide a brief background of the MPIA and its fee waiver provision, and then summarize the facts and procedural history of this case.

### A. The MPIA Permits Official Custodians to Charge and Waive Fees.

The MPIA states that "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees." GP § 4-103(a). Consistent with this broad remedial purpose, the General Assembly requires that we construe the MPIA "in favor of allowing inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection." *Id.* § 4-103(b).

The General Assembly had to balance the statute's broad remedial purpose against the practical and logistical constraints on official custodians[3] to comply with MPIA

---

[3] "'Official custodian' means an officer or employee of the State or of a political subdivision who is responsible for keeping a public record, whether or not the officer or

requests from multiple applicants,[4] some of which might call for production of voluminous records. Producing a record responsive to an applicant's MPIA request can require: a search for the record; scanning and/or photocopying it; reviewing it for items that must be redacted, or may be redacted, in light of statutory provisions;[5] making any such necessary redactions; and delivering the record to the applicant. Thus, if the number of pages of responsive records is in the thousands (or tens or hundreds of thousands), and if the records sought require significant redactions before disclosure, it likely will take many hours of work – sometimes adding up to weeks or months of work – to complete the production.

The General Assembly chose to balance these competing interests by permitting official custodians to charge applicants reasonable fees connected to the time and labor of compiling and producing the requested records. GP § 4-206(b). A "[r]easonable fee" is defined as "a fee bearing a reasonable relationship to the recovery of actual costs incurred by a governmental unit." *Id.* § 4-206(a)(3). The governmental unit may not charge an

employee has physical custody and control of the public record." Md. Code Ann., General Provisions ("GP") § 4-101(f) (2019 Repl. Vol., 2022 Supp.). All further references to the General Provisions Article in the text and footnotes of this opinion, with the exception of citations to § 4-206, will be to the version contained in the 2022 Supplement to the 2019 Replacement Volume, unless otherwise indicated.

[4] An "[a]pplicant" is "a person or governmental unit that asks to inspect a public record." GP § 4-101(b).

[5] *See, e.g.*, GP § 4-351(d)(1) (with respect to records relating to an administrative or criminal investigation of misconduct by a police officer, requiring redaction of medical information of a "person of interest" (*i.e.*, a person "that is the subject of a public record," *id.* § 4-101(g)(1)), personal contact information of the person of interest or a witness, and information relating to the family of the person of interest).

applicant for the first two hours "that are needed to search for a public record and prepare it for inspection." *Id.* § 4-206(c).

1. The Fee Waiver Provision

When the General Assembly first enacted the MPIA in 1970, it prescribed the following for fees associated with record requests:

(a) In all cases in which a person has the right to inspect any public records he may request that he be furnished copies, printouts or photographs for a reasonable fee to be set by the official custodian. Where fees for certified copies or other copies, printouts or photographs of such record are specifically prescribed by law, such specific fees shall apply.

(b) If the custodian does not have the facilities for making copies, printouts or photographs of records which the applicant has the right to inspect, then the applicant shall be granted access to the records for the purpose of making copies, printouts or photographs. The copies, printouts or photographs shall be made while the records are in the possession, custody and control of the custodian thereof and shall be subject to the supervision of such custodian. When practical, they shall be made in the place where the records are kept, but if it is impractical to do so, the custodian may allow arrangements to be made for this purpose. If other facilities are necessary the cost of providing them shall be paid by the person desiring a copy, printout or photograph of the records. The official custodian may establish a reasonable schedule of times for making copies, printouts or photographs and may charge a reasonable fee for the services rendered by him or his deputy in supervising the copying, printing out or photographing as he may charge for furnishing copies under this section.

1970 Md. Laws 1974 (ch. 698) (codified as Article 76A, § 4, of the Annotated Code of Maryland). Thus, the MPIA originally only permitted a custodian to charge reasonable fees for providing copies of requested records and for supervising an applicant in their copying of the requested records.

6

In 1982, the General Assembly added three new provisions to the MPIA related to fees. 1982 Md. Laws 2958 (ch. 431). Section 4(c) of Article 76A expressly broadened the types of fees a record custodian could charge for fulfilling an MPIA request: "Except as provided in subsection (d) of this section, the official custodian may charge reasonable fees for the search and preparation of records for inspection and copying." Md. Code Ann., Art. 76A, § 4(c) (1957, 1980 Repl. Vol., 1983 Supp.).

New section 4(d) stated that an "official custodian may not charge any search or preparation fee for the first 2 hours of official or employee time that is needed to respond to a request for information." Id. § 4(d).

Finally, the General Assembly added a fee waiver provision to the MPIA as new section 4(e): "The official custodian may waive any cost or fee charged under this subtitle if a waiver is requested and the official custodian determines that a waiver would be in the public interest. The official custodian shall consider, among other relevant factors, the ability of the requester to pay the cost or fee." Id. § 4(e).

Two years after this amendment, the MPIA was recodified as part of Subtitle 6, Title 10, of the new State Government Article. See 1984 Md. Laws 1366-67 (ch. 284). The fee waiver provision included new language derived (according to the Revisor's Note) without substantive change from section 4(e) of Article 76A. It provided:

> Waiver. – The official custodian may waive a fee under this section if:
> (1) The applicant asks for a waiver; and
> (2) After consideration of the ability of the applicant to pay the fee and other relevant factors, the official custodian determines that the waiver would be in the public interest.

Id.; Md. Code Ann., State Gov't § 10-621(d) (1984).

7

In 2014, the MPIA was recodified as Title 4 of the General Provisions Article. *See* 2014 Md. Laws 407-09 (ch. 94). The fee waiver provision was recodified as § 4-206(e) without any change in language. *See id.* at 493-94. In 2015, the General Assembly amended § 4-206(e), adding a provision that allows an official custodian to grant a request for a fee waiver where an applicant who asks for a waiver "is indigent and files an affidavit of indigency." GP § 4-206(e)(2)(i); *see* 2015 Md. Laws 619 (ch. 135) & 647 (ch. 136). Since 2015, there have been no changes to the language of § 4-206(e).

2. Dispute Resolution Opportunities Regarding Fees Under the MPIA

As part of the 2015 amendments to the MPIA, the General Assembly created a State Public Information Act Compliance Board (the "Board"). *See* GP § 4-1A-01 (2019 Repl. Vol.); 2015 Md. Laws 604 (ch. 135) & 632 (ch. 136). At the same time, the General Assembly created an Office of the Public Access Ombudsman (the "Ombudsman"). GP § 4-1B-02 (2019 Repl. Vol.); 2015 Md. Laws 613 (ch. 135) & 640 (ch. 136).

One of the Ombudsman's duties is to make "reasonable attempts to resolve disputes between applicants and custodians relating to," among other things, "a request for or denial of a fee waiver under § 4-206(e)[.]" GP § 4-1B-04(a)(6). The MPIA does not provide the Board with authority to consider complaints about fee waiver denials. *See generally* GP § 4-1A-4. However, one of the Board's duties is to "receive, review, and … resolve complaints filed … from any applicant or the applicant's designated representative alleging that a custodian … charged an unreasonable fee under § 4-206 of this title of more than $350[.]" *Id.* § 4-1A-04(a)(1)(ii).

8

3. The MPIA Depends Upon Collaboration.

For the MPIA to work as the General Assembly intends, applicants and custodians must engage in collaborative efforts when the path to fulfillment of a records request presents obstacles. As we have previously observed, "[i]t is often true that a requestor is at a disadvantage in formulating [an MPIA] request because the requestor does not know what records the agency keeps or how it keeps them." *Glass v. Anne Arundel Cnty.*, 453 Md. 201, 232 (2017). As such, we have advised that, when possible, "an agency should in good faith provide some reasonable assistance to the requestor in refining the request for the records the requestor seeks." *Id.* However, an applicant needs to recognize that their submission of a "broadly-worded request" often will present challenges for custodians. *Id.* "Literal compliance with such a request … would often require such a diversion of resources and agency time as to amount to a huge expense." *Id.* at 232-33. For these reasons:

> In practice, a productive response to a PIA request is often an iterative process in which the agency reports on the type and scope of the files it holds that may include responsive records, and the requestor refines the request to reduce the labor (and expense) of searching those records. When the requestor and agency work together, the process approximates the purpose and policy of the PIA. When they do not, what results is the requestor insisting on what, to the agency, is an unbounded and unreasonable search and the agency insisting on what, to the requestor, is an unbounded and unreasonable fee.

*Id.* at 233. As noted above, in 2015, the General Assembly established the Ombudsman's Office. Thus, if initial collaborative efforts between an applicant and a custodian concerning a requested fee waiver are not successful, the parties may attempt to resolve their dispute with the assistance of the Ombudsman. *See* GP § 4-1B-04(a)(6).

9

As we shall see, a breakdown in collaboration occurred in this case.

**B. Facts and Procedural History of This Case**

The record in this case is a tangled web. OJB submitted several broadly and similarly worded MPIA requests to BPD in a short period of time. BPD did not respond timely and fully to all of OJB's requests. Indeed, BPD initially misplaced one of the requests. Once the parties began communicating in earnest, additional errors and misunderstandings plagued the process. Neither party ultimately displayed much willingness to engage in the kind of collaborative process that the MPIA contemplates will occur in challenging situations like this one.

We begin by providing some background about the types of records OJB sought in its MPIA requests to BPD. We then summarize OJB's requests. Next, we recount OJB's filing of this case and the parties' communications concerning a fee waiver. Finally, we discuss BPD's motion to dismiss or, alternatively, for summary judgment, the circuit court's ruling, and OJB's appeal to the Appellate Court.

1. <u>Use of Force Records Generated by the Baltimore Police Department</u>

This appeal concerns records generated by BPD when it conducts an internal investigation into a police officer's use of force. A brief summary of the types of records BPD generates is a helpful foundation to understand the substance of OJB's requests. We note, however, that the policies and procedures discussed below are in flux as the Baltimore Consent Decree Monitoring Team continues its efforts under a consent decree (the "Consent Decree") to remedy constitutional defects in BPD's policing. *See generally City of Baltimore Consent Decree*, City of Balt., available at https://perma.cc/8ZCQ-EY8W

10

(describing the Consent Decree as a "court enforceable agreement to resolve [the Department of Justice's] findings that it believed [BPD] had engaged in a pattern and practice of conduct that violates the First, Fourth, and Fourteenth Amendments to the United States Constitution, and certain provisions of federal statutory law").[6]

BPD has established a classification system for degrees of seriousness of an officer's use of force. Level 1 includes the least serious uses of force, such as "techniques that cause Temporary Pain or disorientation as a means of gaining compliance, hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip), and pressure point compliance techniques." BALT. POLICE DEP'T, POLICY 1115, USE OF FORCE 5 (Nov. 24, 2019) ("Policy 1115"), available at https://perma.cc/S2DJ-XVYP. Level 1 uses of force are "not reasonably expected to cause injury[.]" *Id.*

Level 2 includes "[f]orce that causes or could reasonably be expected to cause an injury greater than Temporary Pain" (provided that it does not rise to a Level 3 use of force). *Id.* Level 3 includes, among other things, use of deadly force and uses of force resulting in loss of consciousness or requiring hospitalization. *Id.* at 6; BALT. POLICE DEP'T, POLICY 710, LEVEL 3 USE OF FORCE INVESTIGATIONS/SPECIAL INVESTIGATION RESPONSE TEAM ("SIRT") 2 (Nov. 24, 2019) ("Policy 710"), available at https://perma.cc/Y7TZ-LU2X.

The SIRT is described in Policy 710 as a "multidisciplinary BPD unit tasked with conducting investigations of Level 3 Use of Force, in-custody deaths, any fatal motor

---

[6] For the full text of the Consent Decree, see https://perma.cc/K4UX-VBAT.

vehicle crash in which the actions of a BPD member were a contributing cause, and investigations specially assigned to SIRT by the Police Commissioner or designee." *Id.* The initial SIRT investigation is considered a criminal investigation, but SIRT also is mandated to "proceed with an administrative investigation of the member's actions." *Id.* According to Policy 710, an appropriate resolution of a use of force incident by SIRT "entails arriving at a suitable recommendation for action to the Public Integrity Bureau (PIB), Office of the State's Attorney (SAO), and Performance Review Board (PRB) based on the information discovered through a thorough, complete, and informed investigation." *Id.* According to BPD, a closed SIRT file could contain between 400 and 600 pages of documents, as well as audio and/or video recordings. Such a file typically would contain a "Force Report," or Form 96, completed by the officer who used the Level 3 form of force. *See* Policy 710. In addition, SIRT investigators are required to generate three specific reports: (1) a 24-Hour Report containing basic facts known within the first 24 hours of investigation; (2) a PRB Presentation that SIRT provides to the PRB after the SAO issues its findings on criminal charges; and (3) a Final Report, after receipt of the PRB's findings, as approved by the Police Commissioner, through which SIRT closes its file. *Id.* at 5.

Level 1 and Level 2 uses of force are also investigated, but not by SIRT. *See generally* Policy 1115. For both Level 1 and Level 2 uses of force, the incident is reviewed by several officials according to a defined procedure. *See* Balt. Police Dep't, Policy 725, Use of Force Review and Assessment (Nov. 24, 2019), available at https://perma.cc/2WVW-P2NG.

According to BPD, each Level 1 and Level 2 use of force incident generates approximately 25 pages of documents.[7]

2. OJB's MPIA Requests to BPD Between December 2019 and February 2020

OJB submitted several requests for records to BPD between December 2019 and February 2020. They can be summarized as follows:

1. Request sent on December 20, 2019: OJB sought all SIRT investigation files that were *closed* between July 1, 2018 and December 19, 2019.

2. Request sent on December 20, 2019: OJB sought all records of all citizen and administrative complaints about BPD that were *closed* between January 1, 2019 and December 19, 2019.

3. Request sent on January 10, 2020: OJB sought all currently *open* SIRT investigation files that had been open for more than 12 months.

4. Request sent on January 10, 2020: OJB sought all currently *open* citizen and administrative complaint files about BPD that had been open for over 12 months.

5. Request sent on January 28, 2020: OJB sought all files for investigations of incidents involving Level 1, Level 2, and Level 3 uses of force that were *closed* between January 1, 2019 and December 31, 2019.[8]

---

[7] In this section of the opinion, we have cited current versions of several BPD policies. BPD is currently in the process of updating its policies regarding use of force. *See, e.g.*, BALT. POLICE DEP'T, DRAFT POLICY 1115, USE OF FORCE 4-5 (July 26, 2023), available at https://perma.cc/5G75-YKJM (receiving public comments from July 27, 2023 – August 28, 2023). Prior iterations of these policies were in effect for much of the period of time relevant to OJB's MPIA requests, but any differences in the policies are immaterial to our analysis.

[8] The record does not include a copy of the January 28, 2020 request, but counsel for BPD and OJB both referred to this request in their communications with each other between March and May of 2020, and BPD described the scope of this request in papers it filed in the circuit court.

13

6. <u>Request sent on February 3, 2020</u>: OJB sought files for investigations relating to a particular officer.[9]

Copies of the first four of the above-listed requests are contained in the record. The signer of each request was "Matt Zernhelt, Esq.," writing on the letterhead of Baltimore Action Legal Team ("BALT"). Mr. Zernhelt wrote in each request that the request was being made on behalf of OJB, and described OJB as "a Baltimore-based organization interested in government policy and conduct" or a "Baltimore-based organization interested in policy and handling of police misconduct." In each request, Mr. Zernhelt asked that BPD waive all fees for production of the records. For example, at the end of the December 20, 2019 request seeking closed SIRT files, Mr. Zernhelt wrote:

> We are prepared to pay reasonable copying costs for reproducing the requested materials but request that you waive any such fees under the GP § 4-206(e), which authorizes you to waive copying fees when doing so would be "in the public interest." Being a program of a non-profit organization the requestor has been deemed a public interest organization, classified tax-exempt, not generating any beneficiary income. Additionally, the requestor seeks the information for a public purpose and concern, as it regards official actions and the agency's performance of its public duty. As it regards the public safety, welfare, and legal rights of the general public, and because it bears implications on the interests of Maryland taxpayers, the request further aligns with the public interest. Furthermore, this request is not for commercial benefit as it is not made by for-profit news media.

> In the event that there are fees, please inform BALT of the total charges in advance of fulfilling this request.

---

[9] The record does not include a copy of the February 3, 2020 request, but counsel for BPD and OJB also both referred to this request in their communications with each other between March and May of 2020, and BPD described the scope of this request in papers it filed in the circuit court. According to BPD, the official custodian located 67 files that were responsive to this request.

On January 11, 2020, BPD's Document Compliance Unit ("DCU") sent an email to Mr. Zernhelt acknowledging receipt of the December 20, 2019 request for closed SIRT files. DCU assigned the tracking number 20-0063 to that request. DCU did not provide a similar acknowledgment with respect to the December 20, 2019 request for closed citizen and administrative complaints. DCU did not timely respond to the January 10, 2020 requests for open SIRT and citizen/administrative complaint files. After Mr. Zernhelt sent separate emails to DCU on February 10, 2020, noting the lack of responses with respect to the January 10, 2020 requests for open SIRT and complaint files, DCU replied only to Mr. Zernhelt's email concerning the request for open complaint files, but failed to acknowledge receipt of that request and instead acknowledged receipt of the February 3, 2020 request for files relating to a specific officer.

3. <u>OJB Files a Complaint in the Circuit Court for Baltimore City.</u>

Having not received timely notification of grant or denial of any of the first four MPIA requests listed above, *see* GP § 4-203(a)(1) ("Except as provided in paragraph (2) of this subsection, the custodian shall grant or deny the application promptly, but not more than 30 days after receiving the application."), OJB filed a Complaint on March 2, 2020, in the Circuit Court for Baltimore City under GP § 4-362 seeking declaratory, injunctive, and other relief in connection with those four requests.

4. <u>The Parties' Communications Between March 17 and May 27, 2020</u>

Wayne Brooks, a Claims Investigator for BPD, sent a letter to Mr. Zernhelt, dated March 17, 2020, in which he responded to four of the above-listed six MPIA requests that OJB had submitted between December 2019 and February 2020. With respect to the

15

request for SIRT investigation files closed between July 1, 2018 and December 19, 2019 (tracking number MPIA-20-0063), Mr. Brooks's letter stated that two Excel spreadsheets were enclosed: a spreadsheet titled "SIRT Investigation 07012018 – 12192019" and a spreadsheet titled "UOF 07012018 – 12192019."[10] It appears that Mr. Brooks and/or DCU interpreted OJB's December 20, 2019 request for closed SIRT investigation files to be seeking files relating to all investigations of uses of force (Levels 1, 2, and 3) that were closed between July 1, 2018 and December 19, 2019.[11]

Mr. Brooks indicated that the closed investigation files requested by OJB were disclosable. However, he stated that OJB's requests for closed citizen and administrative complaint files, open SIRT files, and files relating to the specific officer were denied. Mr. Brooks did not mention OJB's January 10, 2020 request for open citizen and administrative complaint files. Nor did he reference OJB's January 28, 2020 request for investigation files of incidents involving Level 1, Level 2, and Level 3 uses of force that were closed between January 1, 2019 and December 31, 2019.

---

[10] The spreadsheets are not included in the record.

[11] The December 20, 2019 request for closed investigation files specifically requested "[a]ll [SIRT] investigations, including reports and related documents, conducted in response to any and all officer actions, particularly the use of force" for files that BPD closed between July 1, 2018 and December 19, 2019. The request then defined "Use of force" to include Level 1, Level 2, and Level 3 uses of force. It appears that, despite the request's specific reference to investigations conducted by SIRT (which, as we understand it, would involve only Level 3 uses of force), BPD read OJB's definition of "Use of force" to mean that OJB was seeking files for investigations of all levels of use of force that were closed during the July 1, 2018 through December 19, 2019 period, including, but not limited to, investigations conducted by SIRT.

Mr. Brooks stated: "If you would like complete copies of any closed SIRT files, please refer to the attached Excel spreadsheet and provide that list in the order of priority…. Once your list is received, DCU will obtain the selected files and determine with the appropriate unit what files can be segregated and released." Additionally, Mr. Brooks agreed that DCU would inform OJB of the total estimated cost before fulfilling OJB's request for closed investigation files, as OJB had requested. Mr. Brooks stated that "waiver and/or reduction of fees are granted on a case by case basis."

Mr. Zernhelt responded by email on March 18, 2020, informing BPD that OJB had filed a complaint in the Circuit Court for Baltimore City. As such, he requested that, going forward, an attorney communicate with him about OJB's MPIA requests. Kay Harding, then an Assistant Solicitor in the Baltimore City Department of Law, Office of Legal Affairs, contacted Mr. Zernhelt on March 20, 2020, and informed him that she had been assigned to the case. In a letter to Ms. Harding dated March 20, 2020, Mr. Zernhelt took issue with Mr. Brooks's application of several MPIA exemptions to OJB's records requests. He also noted that the "records requested are now past due" and reiterated OJB's requests for fee waivers.

Ms. Harding discovered that DCU had misplaced OJB's January 28, 2020 request. On March 23, 2020, Mr. Zernhelt sent Ms. Harding a copy of the January 28, 2020 request. After reviewing the January 28 request, Ms. Harding emailed Mr. Zernhelt: "The January 28, 2020, request looks identical to the December 20th request. Let me know if I am missing something." Mr. Zernhelt replied that the December 20 and January 10 requests for investigation files "were directed more specifically at SIRT investigations. The January

28th request was for all incidents of force, which may include more Level 1 and Level 2 reporting and follow up."

Ms. Harding replied to Mr. Zernhelt on March 24, 2020, acknowledging that BPD "has not fully responded to your request" and stating that, "due to the voluminous nature of the request, BPD would be requesting an extension to work through your request." *See* GP § 4-203(d)(1) ("[W]ith the consent of the applicant, [any time limit under this subsection] may be extended for not more than 30 days[.]"). Ms. Harding continued: "It appears that there are differing interpretations of the law; however, in the interest of justice and efficiency, let's try to resolve as many outstanding items, as possible and reach an agreement regarding those matters that are not in dispute."

With respect to OJB's request number MPIA 20-0063, Ms. Harding stated that there were 19 responsive SIRT files closed between July 19, 2018 and December 19, 2019, and that "[t]he criminal investigative portions of the file[s] may be provided." Referencing the "SIRT Investigation 07012018 - 12192019" spreadsheet that Mr. Brooks had previously provided to Mr. Zernhelt, Ms. Harding continued:

> From reviewing the spreadsheet, are there any particular files that you desire? Each file will generally contain[] 400-600 pages of documents. Is your client willing to accept only the "summary of the investigation? If not, all files would have to be pulled, copied, scanned, and reviewed. It is estimated that the vast majority of the files that you've requested are not in digital format.
>
> Further, is your client requesting the audio/video interviewed [sic] from the SIRT investigations? If so, the audio/video interviews would have to be copied, as well. Is your client willing to not receive the audio/video files?
>
> If your request is not narrowed or reduced, it is estimated that it would take the Public Integrity Bureau ("PIB") at least 45 days to retrieve the files and provide them to the Document Compliance Unit ("DCU"). Then, DCU

would have to process the production of the release for each file. It is estimated that it would take DCU at least 30 days to process all 19 files for release, which would practically mean that this request could not be fulfilled until late-June/July 2020. The estimated associated cost would be thousands of dollars and overtime hours would have to be approved.

Is your client open to narrowing its request?

Notwithstanding Mr. Zernhelt's prior clarification that the December 20 request for closed investigation files specifically related to SIRT files, Ms. Harding also provided information about 13,439 use of force files that were closed between July 1, 2018 and December 19, 2019, including Level 1 and Level 2 use of force files. Ms. Harding asked Mr. Zernhelt to "confirm that you are requesting all of the portions of the 13,439 files that may be disclosed to be provided. If you are requesting all of the files, please consider narrowing your request as your request is voluminous."[12]

Ms. Harding confirmed that closed citizen and administrative complaints, as well as open SIRT files, would not be produced for the reasons stated in Mr. Brooks's letter. Ms. Harding stated that DCU had logged in OJB's January 28, 2020 request on March 23, 2020 and was currently reviewing that request. Ms. Harding also wrote that, based on the nature of the January 28 request, BPD would be requesting an extension of time to respond to it.

On March 26, 2020, Mr. Zernhelt responded by email to Ms. Harding's email of March 24. In a section of his email under a heading of "MPIA 20-0063 (December 20, 2019)," Mr. Zernhelt confirmed that OJB was seeking all 19 SIRT files that were closed between July 1, 2018 and December 19, 2019. Mr. Zernhelt said that OJB would accept

---

[12] As discussed below, the 13,439 number was subsequently determined to be inaccurate.

case summaries in the immediate term while it waited "for the reproduction of the entire files." OJB could not determine how to prioritize receipt of the 19 files, as the names of the officers were redacted in the spreadsheet Mr. Brooks had provided. Mr. Zernhelt further stated that OJB was requesting the audio/video included in the files.

Mr. Zernhelt also effectively broadened the December 20, 2019 request at that time to include all closed use of force investigation files: "Yes, we are requesting all 13,439 files, each including a Form 95, Offense Report, and Statement of Probable Cause. Will you provide the Level I and Level II Use of Force administrative investigations, up to the point of a disciplinary investigation transition? I understand they can turn into personnel matters, but the end result should not taint what was not previously a personnel record. The Use of Force records are collected for other purposes."

In light of Mr. Zernhelt's response, Ms. Harding sent two cost estimates to Mr. Zernhelt on April 7, 2020, which laid out in detail the costs associated with collecting, reviewing, scanning, and redacting all responsive documents under MPIA 20-0063 (which both parties now understood to include Level 1, 2, and 3 use of force investigation files that were closed between July 1, 2018 and December 19, 2019). Between the two cost estimates, BPD quoted a total cost of $1,431,475.50.

At the end of the cost estimates, Ms. Harding included the following (seemingly boilerplate) statement regarding a fee waiver: "If you believe that you are eligible or entitled to a total or partial fee waiver, pursuant to § 4-206(e), please provide an affidavit of indigence and/or the reason for the fee waiver request."

Mr. Zernhelt replied in an April 7, 2020 email that each of OJB's MPIA requests had "included a public interest fee waiver request, which were again repeated in letters and email communications." He added:

> Disclosure will benefit community relations, as these records will bolster BPD's accountability to the community. Records will enable transparency into the thoroughness of investigations and the reliability of leadership. This is foundational for communication and trust. Further, OJB is not requesting these records for commercial gain.

Mr. Zernhelt asked whether BPD had denied OJB's fee waiver requests.

On April 8, 2020, Ms. Harding replied by email to Mr. Zernhelt that BPD had not denied OJB's request for a fee waiver for the closed investigation files:

> The Public Information Act contemplates fee waivers for those who are indigent, defined as "an individual's family household income is less than 50% of the median family income for the State as reported in the Federal Register" or for entities that cannot pay the fee. Md. Code, Gen. Prov., § 4-206(e). While I understand that Open Justice Baltimore is a non-profit that desires all fees be waived, could you consider narrowing the scope of the request to minimize costs? That would certainly reduce the fee and the time it would take to get responsive records. If not, could you please articulate any other reasonable factors that can help BPD in considering your request to waive all of these fees? That request has not been denied, as BPD is committed to transparency and dissemination of information to the public that restores trust in the police department.

Mr. Zernhelt replied to Ms. Harding later on April 8, noting that "[f]ee waivers are not restricted to individuals. We have made a fee waiver request at near every stage, providing reasons for why the requestor would be entitled and why the transparency that would be granted would be in BPD's and the public's interest…. The transparency would allow trust to grow. The entirety of the request is necessary for this effect. We continuously request, but find our question evaded."

21

Mr. Zernhelt also raised questions about the accuracy of the information in the April 7 cost estimates, which led BPD to determine that the estimates had included substantial errors due to duplicates found in the list of responsive documents. Suffice it to say that there were not actually more than 13,000 closed use of force investigation files for the period from July 1, 2018 through December 19, 2019 – in fact, there were nowhere near that many.

On April 13, 2020, Ms. Harding emailed Mr. Zernhelt that BPD "has denied your fee waiver request." Ms. Harding did not provide any explanation for the denial.[13]

On April 15, 2020, Ms. Harding sent a revised cost estimate that eliminated the duplications. In the revised estimate, the files that BPD identified as responsive to OJB's request number 20-0063 included 2,318 Level 1 and Level 2 use of force files and 18 Level 3 use of force/SIRT files. BPD estimated that the total cost to produce these 2,336 files would be $245,123.[14] BPD stated that "[t]he total cost is required to commence production on your request." At the end of this cost estimate, Ms. Harding again included the following statement regarding a fee waiver: "If you believe that you are eligible or entitled to a total

---

[13] It is somewhat unclear whether the April 13 communication regarding denial of the requested fee waiver was in relation to the December 20, 2019 request for closed use of force investigation files or the January 28, 2020 request for closed use of force investigation files, or both. Because Mr. Zernhelt had effectively broadened the scope of the December 20, 2019 request to include Level 1 and Level 2 use of force investigation files, the December 20 and January 28 requests largely overlapped.

[14] At first, BPD referred to 18 SIRT files, but BPD later corrected this and stated that there were 19 SIRT files, bringing the total estimated cost of production for 2,337 responsive files to $245,670.

or partial fee waiver, pursuant to § 4-206(e), please provide an affidavit of indigence and/or the reason for the fee waiver request."

On May 14, 2020, Mr. Zernhelt sent a final fee waiver request to Ms. Harding.[15] Mr. Zernhelt wrote:

> We would again request a fee waiver in the public interest for these records. We would prioritize initial disclosure of the SIRT records .… As we have stated on numerous occasions, starting with each initial request, it is in the public interest that these records be disclosed. Due to the history of corruption and violence within and imposed by BPD, documented by the 2016 Department of Justice Report, operation of the Gun Trace Task Force and statements from its prosecution, Sgt. Dohoney's indictment, recent BPD shootings, and other events, there is compromised trust between the community and BPD (documented specifically in the DOJ Report at page 47, to start). Ongoing secrecy continues suspicion.
>
> Opening transparency in matters of internal investigations and accountability will be a step towards trust, allowing Baltimore to build a stronger relationship with its police department. Transparency can conquer false narratives that currently circulate. The community will have faith to turn to BPD for protection as they will have reason to believe individual officers are held to a high standard. The word of BPD will not be looked upon with skepticism.
>
> However, you have locked out this opportunity. The funds you have imposed have created a mountain to prevent access. The requestor is a program under nonprofit status, with extremely restricted funds. All of Open Justice Baltimore's funds are put into its community programming and no excess funds exist. (Moreover, this request is not being made to draw profit).
>
> Being so, BPD's denial of our request was improper. Please let me know at your earliest convenience if these fees can be waived and if reproduction of these records can begin.

Ms. Harding responded on May 27, 2020, stating "BPD stands by its decision."

---

[15] Between April 15 and May 14, the number of closed Level 3/SIRT files increased from 19 to 40. There is no explanation in the record for this change.

5. The Circuit Court Proceedings

As discussed above, on March 2, 2020, after BPD initially failed to provide timely responses to OJB's December 20, 2019 and January 10, 2020 MPIA requests, OJB filed a lawsuit in the Circuit Court for Baltimore City. In its Complaint, OJB alleged that BPD was "in blatant violation of the timing requirements imposed by law" and had "disregarded its responsibilities under the [MPIA]." OJB asked the court, among other things, to order BPD to provide the records covered in the four MPIA requests within 10 days. In addition, OJB asked that the court order BPD to waive all fees associated with the MPIA requests. After BPD denied a fee waiver for the one MPIA request as to which it granted inspection (the request for closed use of force investigation files), OJB argued that the denial of the fee waiver was arbitrary and capricious.

The parties subsequently filed a series of papers disputing both factual and legal matters. In its motion to dismiss, or in the alternative, for summary judgment, filed on August 18, 2020, BPD acknowledged its lack of timeliness and lack of responsiveness, but represented that the delays were not intentional but rather were the result of understaffing, BPD's assigned Public Information Act Representative being out of the office on vacation for a period of time, the voluminous nature of OJB's requests, and the large number of MPIA requests BPD received during this period.[16]

---

[16] BPD provided an affidavit from Dana Abdul Saboor of DCU, who attested that between December 20, 2019 and January 6, 2020, DCU received 66 MPIA requests and that between January 1, 2020 and February 28, 2020, DCU received 395 MPIA requests.

24

With respect to OJB's challenge to the fee waiver denial, BPD argued that its denial of the fees quoted in the April 15, 2020 cost estimate for production of 2,318 Level 1 and Level 2 files, and 19 Level 3/SIRT files, was not arbitrary and capricious. According to BPD, it was OJB's burden to establish that the requested information was "in the public interest because it is likely to contribute significantly to the public understanding of the operations and activities of the government." BPD claimed that

> the Custodian reviewed Plaintiff's statements concerning [its] ability to pay and whether the disclosure "is likely to contribute significantly to public understanding of the operations and activities of the government" – the "other factor," and exercised his discretionary authority to deny the Plaintiff's fee waiver request.

BPD asserted that OJB's request "lack[ed] specificity regarding its public interest and public purpose." BPD claimed that OJB did not explain how disclosure of the requested records would help the public understand BPD procedures. Nor had OJB demonstrated its "expertise in reviewing or analysis [sic] criminal investigations, [SIRT] investigations, or the mechanics of internal affairs investigations." According to BPD, OJB's "broad and wide-reaching requests appear[ed] to be nothing more than a fishing expedition[.]"

BPD attached to its motion the Affidavit of Eric Melancon, then the Chief of Staff to Commissioner Harrison. Mr. Melancon stated in his affidavit that one of his duties was to review MPIA fee waiver requests and determine if a fee waiver should be granted or denied. Mr. Melancon stated that BPD posts "extensive information" on its website that is "intended to provide an understanding of the work the department is doing to underscore its commitment to professionally serve and protect Baltimore's residents, workers, and visitors." He also wrote that "[s]hould [OJB] wish to better understand BPD's operations,"

25

OJB could consult BPD's website for copies of various documents "relating to officer integrity and accountability," and OJB also could review the Consent Decree Monitoring Team's semi-annual reports and other relevant materials.

Mr. Melancon then wrote that he "carefully reviewed [OJB's] fee waiver request, consulted with counsel, and ultimately denied OJB's fee waiver request." He further stated:

> I reached this decision, in part, because OJB did not provide sufficient information to establish its need for a fee waiver. OJB's articulated public interest purpose for the records was extremely general and vague. The reasons OJB provided for its request did not explain its public interest purpose or how the disclosure would achieve its purpose.
>
> Additionally, I determined that the materials sought would not likely "contribute significantly to public understanding of the operations and activities of the [BPD]" and therefore the request was not in the public interest so as to justify a fee waiver.
>
> The materials sought by OJB's requests are protected from disclosure by the MPIA … and potentially other law…. The documents sought would likely be heavily redacted and thus not understandable to the public.
>
> Much thought was given to OJB's request, but it was determined that OJB's fee waiver request did not meet the public interest standard or factors. In reaching this conclusion, BPD did consider the overall cost of production, budgetary constraints, and manpower shortages in the Public Integrity Bureau, but these consideration [sic] did not drive the decision.

(Paragraph numbers omitted). BPD also argued that it appropriately denied OJB's other requests for records.

The circuit court held a hearing on November 18, 2020, and issued its ruling on February 26, 2021. The court noted that BPD had denied several of OJB's MPIA requests. With respect to the "remaining records that BPD was willing to disclose," the court recited that "BPD provided [OJB] with an initial estimate of costs necessary for production of the

records." The court referenced the 2,336[17] Level 1, Level 2, and Level 3 use of force files that were described in BPD's April 15, 2020 cost estimate. The circuit court upheld BPD's denial of OJB's request for the waiver of the fees to produce the Level 1, Level 2, and Level 3 use of force files: "Given the volume of records sought by [OJB] and the time and cost necessary to produce the records, BPD did not arbitrarily or capriciously deny the fee waiver."

The circuit court agreed with OJB that BPD improperly denied disclosure of closed citizen and administrative complaints, but stated that such records would need to be redacted in such a way as to remove them from the category of personnel records identifiable to an individual. The court ordered BPD to provide a cost estimate to OJB for production of the closed citizen and administrative complaint files with the necessary redactions.[18] Although the circuit court overturned BPD's decision to deny disclosure of the closed citizen and administrative complaints, the circuit court found that "BPD acted in good faith in attempting to work with [OJB] to reframe its request to get the information that it sought."

---

[17] As noted above, there was a discrepancy concerning the number of closed SIRT files. At one point, BPD told OJB there were 18 such closed files, but later said there were 19. It appears that the circuit court referred to 2,336 closed files based on BPD's incorrect reference in the April 15 cost estimate to 18 closed SIRT files.

[18] The record does not indicate whether BPD subsequently denied OJB's requested fee waiver for closed citizen and administrative complaint files. In any event, that MPIA request is not before us.

The circuit court upheld BPD's denial of disclosure of open SIRT investigation files.[19]

6.  The Appellate Court's Opinion

OJB appealed the circuit court's ruling upholding BPD's denial of disclosure of open SIRT investigation files and BPD's denial of the fee waiver for closed use of force investigation files. BPD did not cross-appeal that portion of the circuit court's ruling that held it was required to disclose closed citizen and administrative complaint files to OJB with redactions.

In an unreported opinion, the Appellate Court upheld the circuit court's decision with respect to BPD's denial of inspection of open SIRT investigation files. *Open Justice Baltimore v. Baltimore City Police Dep't*, No. 122, Sept. Term, 2021, 2022 WL 354486 (Feb. 7, 2022). However, the intermediate appellate court reversed the circuit court's ruling relating to the fee waiver denial and held that BPD's denial of OJB's fee waiver request was arbitrary and capricious. 2022 WL 354486, at *10. The Appellate Court relied on its recent decision in *Baltimore Action Legal Team v. Office of State's Attorney of Baltimore City*, 253 Md. App. 360 (2021):

> The instant issue and arguments are virtually identical to those raised in *Baltimore Action Legal Team*. On the record before us, we are unable to conclude that the court had sufficient facts from which it could reasonably conclude that appellees had meaningfully considered the very same infamous

---

[19] The circuit court's ruling was silent regarding OJB's MPIA request for open citizen and administrative complaints.

28

allegations and publicized controversy as were at issue in *Baltimore Action Legal Team*.

*Open Justice Baltimore*, 2022 WL 354486, at *10.[20]

BPD filed a petition for a writ of *certiorari*, which we granted on September 23, 2022. *Baltimore Police Dep't v. Open Justice Baltimore*, 482 Md. 7 (2022).[21] We have reordered and rephrased the questions for which BPD sought review as follows:[22]

1. What are the parameters of the discretion that the MPIA vests in an official custodian in reviewing a fee waiver request under GP § 4-206(e)?

2. Did the Appellate Court properly hold that BPD's denial of OJB's request to waive fees for the production of closed Level 1, Level 2, and Level 3 use of force investigation files was arbitrary and capricious?

---

[20] We discuss the Appellate Court's opinion in *Baltimore Action Legal Team* at length below.

[21] OJB did not seek further review of that part of the Appellate Court's opinion in which the Appellate Court affirmed the denial of inspection of open SIRT files.

[22] The questions as BPD presented them in its petition asked:

1. Does the discretionary language in Maryland Code, General Provisions Article, § 4-206(e), stating that, under certain conditions, "[t]he official custodian may waive a fee under this section," <u>require</u> the official custodian to waive a fee when police misconduct investigation records are requested?

2. When an official custodian denies a fee waiver request in good faith, but a reviewing court rules that the denial is arbitrary and capricious for failure to consider an additional relevant factor, is the proper remedy a remand to the agency to consider that additional factor, or summary reversal (i.e., ordering the agency to waive the fee)?

3. Did the Court of Special Appeals err by reversing the circuit court's affirmation of BPD's fee waiver denial when there was sworn affidavit evidence in the record that BPD had considered the relevant factors in determining that the requested waiver was not in the public interest?

3. If BPD erroneously denied OJB's fee waiver request, what is the proper remedy?

**II**

**Standard of Review**

The proper interpretation of the MPIA's fee waiver provision presents a question of law that we review *de novo. Pabst Brewing Co. v. Frederick P. Winner, Ltd.*, 478 Md. 61, 74-75 (2022).

The parties disagree as to the standard that reviewing courts apply to a custodian's denial of an MPIA fee waiver request. Identifying the proper standard of review presents a question of law that we review *de novo*. *See, e.g.*, *Alahad v. State*, 362 So. 3d 190, 197 (Fla. 2023); *Butler v. Dunlap*, 931 P.2d 1036, 1038 (Alaska 1997). For the reasons discussed below, we conclude that a custodian's decision to deny a fee waiver request under the MPIA must be upheld unless it is arbitrary or capricious. That is the standard that we will apply when reviewing BPD's denial of OJB's requested fee waiver.

Finally, identification of the proper remedy in the event of an arbitrary or capricious decision to deny a fee waiver presents a question of law. As such, our review of that question is *de novo*. *See Dickson v. United States*, 478 Md. 255, 260 (2022); *see also Washington Suburban Sanitary Comm'n v. LaFarge*, 443 Md. 265, 279-88 (2015) (conducting statutory interpretation analysis in determining whether to remand to the agency for a complete "do-over" or to remand to the agency for a narrower determination).

## III

## Discussion

Before we address the merits of the parties' competing arguments, we first consider whether the circuit court had jurisdiction to hear OJB's challenge to BPD's denial of its requested fee waiver. At the time OJB filed its complaint in the circuit court, the MPIA provided for judicial review "whenever a person or governmental unit is denied inspection of a public record or is not provided with a copy, printout, or photograph of a public record as requested[.]" GP § 4-362(a) (2019 Repl. Vol.). To the extent OJB sought judicial review of BPD's decision to deny inspection of open SIRT files and closed citizen and administrative complaint files, the circuit court had jurisdiction under GP § 4-362(a) to rule on OJB's challenge. However, § 4-362(a) is silent concerning judicial review of an official custodian's denial of a fee waiver request under § 4-206(e). The judicial review provisions contained in Maryland's Administrative Procedure Act ("APA") also do not apply here, because BPD is a locally funded governmental unit. *See* Md. Code Ann., State Gov't ("SG") § 10-203(a)(4) (2021).

BPD asserts that the circuit court had jurisdiction to review OJB's challenge to BPD's denial of the fee waiver as an administrative mandamus action. We agree with BPD that the part of OJB's complaint that challenged the denial of the fee waiver was in the nature of an administrative mandamus action. That is the case because, as to the denial of the fee waiver, there was "both a lack of an available procedure for obtaining review and an allegation that the action complained of is illegal, arbitrary, capricious or unreasonable." *Mayor and City Council of Balt. v. ProVen Mgmt., Inc.*, 472 Md. 642, 669 n.9 (emphasis

deleted) (internal quotation marks and citation omitted); *see also* Md. Rule 7-401(a) (explaining that the rules applicable to administrative mandamus "govern actions for judicial review of [an] … action of an administrative agency where review is not expressly authorized by law"). Thus, the circuit court had jurisdiction to rule whether BPD's denial of the requested fee waiver was arbitrary and capricious. *See also Heaps v. Cobb*, 185 Md. 372, 379-80 (1945) (explaining that "[w]here the statute or ordinance makes no provision for judicial review, an implied limitation upon an administrative board's authority is that its decisions be supported by facts and that they be not arbitrary, capricious or unreasonable," and that "[c]ourts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts; but in exercising that power care must be taken not to interfere with the legislative prerogative" (internal quotation marks and citation omitted)).

### A. The Parameters of an Official Custodian's Discretion to Grant or Deny a Fee Waiver Under GP § 4-206(e)

The MPIA's fee waiver provision states:

The official custodian may waive a fee under this section if:
  (1) the applicant asks for a waiver; and
  (2) (i) the applicant is indigent and files an affidavit of indigency; or
      (ii) after consideration of the ability of the applicant to pay the fee and other relevant factors, the official custodian determines that the waiver would be in the public interest.

GP § 4-206(e). The parties dispute the extent of an official custodian's discretion to waive a fee under § 4-206(e).

As we have stated previously, the goal of statutory interpretation is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under

32

consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). In conducting this inquiry, "we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (internal quotation marks and citations omitted). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose, [the] inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). "We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal quotation marks and citations omitted). Rather, we construe the statute "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006).

We do not "read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275. "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. We presume "that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* To the extent there is ambiguity in statutory language, we

strive to resolve it by "searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* We also often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language. *Rowe v. Maryland Comm'n on C.R.*, 483 Md. 329, 343 (2023). Further, we "check our interpretation against the consequences of alternative readings of the text, which grounds the analysis." *Id.* (cleaned up). Doing so helps us "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Mayor & Town Council of Oakland*, 392 Md. at 316.

OJB believes that the General Assembly intended to leave official custodians with relatively little discretion to deny fee waivers. According to OJB, "if disclosure of records is in the public interest, a fee waiver is also in the public interest." As we understand the argument, once a custodian determines that the public would benefit from disclosure of requested records, the official custodian must also find that a waiver of the fees to produce those records would be in the public interest and, therefore, the custodian in that instance must grant the fee waiver.

BPD, for its part, argues that the statute

does not *require* a custodian to waive anything, but rather *permits* a custodian to do so when two conditions are met…. Those conditions are (1) if the applicant asks for a waiver, <u>and</u> (2) if the applicant files an affidavit of indigency <u>or</u> if *the custodian determines* that the waiver would be in the public interest after considering ability to pay and other relevant factors.

BPD believes that the statute also vests custodians with the discretion to determine what the "other relevant factors" are in a particular case before deciding whether the

34

consideration of those factors and the applicant's ability to pay show that a fee waiver would be in the public interest. Thus, according to BPD, the custodian has three levels of discretion when considering a public interest fee waiver under GP § 4-206(e)(2)(ii): (1) discretion to decide which other factors besides ability to pay are relevant to the public interest determination; (2) discretion to decide whether the application of all relevant factors demonstrate that a waiver would be in the public interest; and (3) if a waiver would be in the public interest, discretion to grant or deny the fee waiver.

Both parties' interpretations miss the mark to some extent. First, OJB's interpretation effectively reads out of § 4-206(e)(2)(ii) the requirement that a custodian consider "the ability of the applicant to pay the fee and other relevant factors" in determining whether a requested fee waiver would be in the public interest. Under OJB's interpretation, once the custodian determines that the public would benefit from the disclosure of the requested records, the custodian must conclude that a fee waiver would be in the public interest. This interpretation fails to recognize that in some cases, notwithstanding the determination that the public would benefit from disclosure of requested records, the applicant's ability to pay and/or other factors, beyond the public benefit from disclosure, could reasonably lead the custodian to conclude that it would not be in the public interest to waive the fees for production in whole or in part. OJB's interpretation conflicts with the plain language of GP § 4-206(e)(2)(ii), and we therefore reject it.

BPD's interpretation also is problematic. We do not think the General Assembly intended to allow custodians to determine that a fee waiver would be in the public interest

35

and nevertheless deny it. Notably, § 4-206(e)(2) contemplates two different scenarios that may result in a custodian granting a fee waiver if the applicant requests such a waiver. First, under subsection (e)(2)(i), the custodian "may waive a fee … if … the applicant is indigent and files an affidavit of indigency." Second, under subsection (e)(2)(ii), the custodian "may waive a fee … if … after consideration of the ability of the applicant to pay the fee and other relevant factors, the official custodian determines that the waiver would be in the public interest."

The phrase "may waive a fee … if" appears in the top line of subsection (e) and thus applies to both subsection (e)(2)(i) and subsection (e)(2)(ii). The word "may" signals that the General Assembly intended to vest an official custodian with discretion in deciding whether to grant a fee waiver under both subsections. *See Office of Att'y Gen. v. Gallagher*, 359 Md. 341, 353-54 (2000) (reasoning that former SG § 10-618 (now GP § 4-343), the provision of the MPIA stating that "if a custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest, the custodian may deny inspection by the applicant of that part," was "a discretionary provision" because of the use of the word "may"); *see also Uthus v. Valley Mill Camp., Inc.*, 472 Md. 378, 394 (2021) (noting "this Court's long history of interpreting the statutory term 'may' as discretionary, as opposed to the mandatory term 'shall'").

However, the General Assembly spelled out much more about how custodians are to exercise their discretion in subsection (e)(2)(ii) than in subsection (e)(2)(i). In subsection (e)(2)(i), the custodian "may" grant a waiver if the applicant is indigent and files an affidavit of indigency. The custodian is not required to grant a waiver in the event an

indigent applicant files an affidavit of indigency. But the statute does not specify any other factors a custodian must consider when deciding whether to exercise its discretion to grant a fee waiver request submitted by an indigent applicant. In other words, subsection (e)(2)(i) contemplates that there likely will be instances where custodians will grant fee waiver requests by indigent applicants as well as instances where custodians will deny fee waiver requests by indigent applicants, after consideration of unspecified factors.

In subsection (e)(2)(ii), the General Assembly provided that a custodian may grant a requested fee waiver if, "after consideration of the ability of the applicant to pay the fee and other relevant factors, the official custodian determines that the waiver would be in the public interest." As we read this subsection, the General Assembly has told custodians, in some specific and some general terms, everything they must do to determine whether a requested fee waiver would be in the public interest. A custodian must consider the ability of the applicant to the pay the fee, and the custodian must also consider other factors that are relevant to determining whether a waiver would be in the public interest. The General Assembly has not specified what the "other relevant factors" are. However, in every case where a custodian is considering a public interest waiver under subsection (e)(2)(ii), the custodian must at least consider whether there would be any public benefit to disclosure of the requested records. Beyond that factor and the applicant's ability to pay, we agree with BPD that the MPIA vests the custodian with discretion to determine which factors are relevant to the public interest determination in a particular case.

We also agree with BPD that, once the custodian has determined what those "other relevant factors" are, the custodian has discretion to decide whether, on balance, the

consideration of those "other relevant factors" along with the applicant's ability to pay and the benefit (if any) to the public from disclosure, shows that *waiver of the fee* would be in the public interest. However, where we disagree with BPD is at the next step in the process: if, after balancing all of those factors, the custodian determines that a fee waiver (in whole or in part) would be in the public interest, the custodian at that point must grant the full or partial waiver. In other words, the General Assembly limited the custodian's discretion in subsection (e)(2)(ii) to deciding which other factors are relevant to the public interest determination and to making the public interest determination. The General Assembly did not vest the custodian with discretion to arbitrarily deny a fee waiver after determining that a waiver would be in the public interest. A contrary interpretation of § 4-206(e)(2)(ii) would be unreasonable. *See Mayor & Town Council of Oakland*, 392 Md. at 316 (explaining that we seek to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense").

These considerations lead us to conclude that, in providing that the official custodian "may waive a fee" if either of the conditions of subsection (e)(2)(i) or (e)(2)(ii) is met, the General Assembly meant that the custodian is authorized to grant a fee waiver only if one of those circumstances exists. If neither of the circumstances set forth in subsection (e)(2)(i) or (e)(2)(ii) exists – *i.e.*, if (i) the applicant is not indigent or does not file an affidavit of indigency, or (ii) the custodian, after considering the applicant's ability to pay

the fee and the other relevant factors, does not determine that a waiver of the fee would be in the public interest – then the custodian may not waive the fee.[23]

If the first circumstance is met (the applicant is indigent and files an affidavit of indigency), the custodian still has a discretionary determination to make in deciding whether to waive the fee. If the second circumstance is met (*i.e.*, after consideration of the relevant factors, the custodian determines that either a partial or total waiver would be in the public interest), there is no more discretionary work left for the custodian to do. A denial of a fee waiver, after concluding that it would be in the public interest, would necessarily be an arbitrary and capricious administrative action.[24]

Three related observations are in order. First, the statute requires the custodian to ground its discretionary decision to grant or deny the fee waiver request in its weighing of *all* relevant factors. That is, after the custodian decides whether a fee waiver would be in the public interest, there should be no relevant factor left to consider. Put another way, a custodian cannot properly determine whether a fee waiver would be in the public interest

---

[23] Our interpretation is consistent with the limited legislative history concerning the enactment of the MPIA's fee waiver provision in 1982. The Governor's Information Practices Commission, which introduced the legislation that added the MPIA's fee waiver provision, wrote that the proposed legislation "would grant the custodian discretionary authority to charge reasonable fees for the search and preparation of records for inspection and copying, but only after the passage of two hours of official or employee time needed to respond to a request for information. The custodian also could waive such fees if he determined that a waiver would serve the public interest."

[24] If the custodian had sufficient reason to make the discretionary decision to deny the request, that reason would have been accounted for in the custodian's consideration of the relevant factors in the first instance, which in turn would have culminated in the custodian's determination that a fee waiver is *not* in the public interest, which in turn would mean that the custodian had no discretion to grant the waiver in the first place.

until the custodian has considered all relevant factors. The determination whether the requested fee waiver would be in the public interest is the end of the custodian's analytical process under subsection (e)(2)(ii).

Second, the custodian should consider, as part of the public interest determination, whether it would be in the public interest to waive all, part, or none of the fees for producing the requested records. In other words, depending on the application of all relevant factors in a particular case, it may be reasonable for a custodian, acting in good faith, to conclude that it would be in the public interest to grant a partial fee waiver, but not a full fee waiver.

Third, the "other relevant factors" may vary from case to case. We will not attempt to provide an exhaustive list of considerations that a custodian could reasonably conclude are relevant factors in making the public interest determination in a particular case. However, two related factors that likely will be relevant in many cases are the cost to the agency and the burden on the agency's personnel to comply with the request. In *Mayor and City Council of Baltimore v. Burke*, the Appellate Court of Maryland held that a fee waiver denial was arbitrary and capricious where, in addition to the applicant's ability to pay, the agency "considered no more than the expense to the City of locating and duplicating the documents" to determine if a waiver would be in the public interest. 67 Md. App. 147, 157 (1986) (cleaned up). We agree with *Burke*'s holding. In every case where a custodian makes a public interest determination under GP § 4-206(e)(2)(ii), the custodian must consider, as at least one other relevant factor, whether disclosure of the requested records would provide a benefit to the public. The custodian in *Burke* did not do that, rendering its exercise of discretion arbitrary and capricious. However, it would be incorrect to conclude

40

from *Burke* that an agency may not consider the monetary cost and/or the burden on an agency's personnel as "other relevant factors" in making a public interest determination.[25]

In sum, we conclude that an official custodian has discretion under GP § 4-206(e)(2)(ii) to decide which other factors, besides the applicant's ability to pay the fee and whether there is a public benefit to disclosure, are relevant to the discretionary determination of whether granting a fee waiver would be in the public interest in a particular matter. The custodian also has discretion to decide, after considering all relevant factors, whether it would be in the public interest to grant a waiver of the fee in whole or in part. However, if a custodian determines that it would be in the public interest to waive all or part of the fees to produce the requested records, the custodian does not have discretion at that point to deny the partial or full waiver.

## B. BPD's Denial of OJB's Requested Fee Waiver Was Arbitrary and Capricious.

### 1. Standard of Review

Before we consider the merits of the parties' arguments concerning whether BPD's denial of OJB's requested fee waiver was erroneous, we must identify the proper standard of review for that inquiry. As noted above, the parties dispute that question. OJB and *Amici*

---

[25] In addition, we note that the Maryland Attorney General's Public Information Act Manual provides commentary and citations to federal Freedom of Information Act ("FOIA") cases concerning factors that may be relevant to the determination of whether a fee waiver would be in the public interest. *See* MD. OFF. OF THE ATT'Y GEN., MARYLAND PUBLIC INFORMATION ACT MANUAL, CH. 7, at 6-9 (17th ed. 2022), available at https://perma.cc/92HZ-8HG6. We discuss FOIA's fee waiver provision below.

*Curiae*[26] argue that courts reviewing a custodian's fee waiver denial should apply a *de novo* standard. BPD responds that OJB waived any argument in favor of a *de novo* standard of review by arguing in the circuit court and the Appellate Court that BPD's fee waiver denial was arbitrary and capricious. BPD also observes that OJB did not file a cross-petition for *certiorari* seeking review of the Appellate Court's application of the arbitrary and capricious standard. BPD alternatively argues that the arbitrary and capricious standard is applicable here.

### a. Waiver

It is true that OJB argued below that BPD's denial of the fee waiver was arbitrary and capricious; that OJB did not cross-petition for *certiorari* regarding the proper standard for review of a fee waiver denial; and that the first time OJB argued for a *de novo* standard was in its brief in this Court. Normally, this trifecta of forfeiture and waiver concerning an issue would likely spell doom for a party's request that we review the issue. *See* Md. Rule 8-131(b) ("Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Appellate Court or by a circuit court acting in an appellate capacity, the Supreme Court ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Supreme Court."). However, as the Appellate Court of Maryland and several federal appellate courts have explained, "a party cannot 'waive' the proper standard of

___

[26] The ACLU of Maryland, Public Justice Center, and the Washington Lawyers' Committee for Civil Rights and Urban Affairs filed a "Brief of *Amici Curiae* Public Interest Organizations in Support of Appellee" advocating for a *de novo* standard of review with respect to challenges to the denial of a fee waiver under the MPIA.

review by failing to argue it." *State v. Philip Morris, Inc.*, 225 Md. App. 214, 237 (2015) (quoting *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008), *overruling on other grounds recognized by Moritz v. Lafler*, 525 F. App'x 277, 285 n.5 (6th Cir. 2013), and collecting federal cases). This is the case because it is "the court, not the parties, [which] must determine the standard of review." *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001). Thus, "[s]uch a determination remains for [a reviewing] court to make for itself." *Philip Morris*, 225 Md. App. at 237 (quoting *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996)).

It is debatable whether the identification of the proper standard of review in circuit court proceedings on judicial review of an agency decision constitutes an "issue … [that was] raised in or decided by the trial court," within the meaning of Rule 8-131(a). *See* Md. Rule 8-131(a) (providing that, with the exception of subject matter jurisdiction and (unless waived under Maryland Rule 2-322) personal jurisdiction, "[o]rdinarily, an appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court"). Assuming without deciding that it is, given the centrality of the standard of review to the appellate process, and because this is the first case in which this Court is considering a challenge to a custodian's denial of a fee waiver, we exercise our discretion under Rule 8-131 to decide the proper standard under which to review such a challenge.

*b. The Arbitrary and Capricious Standard Applies to Judicial Review of Denials of Fee Waivers under the MPIA.*

Although this is our first case addressing an MPIA fee waiver denial, the Appellate Court has issued three reported opinions in such cases. *See Burke*, 67 Md. App. at 147; *Action Committee for Transit, Inc. v. Town of Chevy Chase*, 229 Md. App. 540 (2016); *Baltimore Action Legal Team*, 253 Md. at 360. In *Action Committee for Transit*, the Appellate Court considered and rejected an applicant's argument that the court should apply the *de novo* standard of review, opting instead to apply the arbitrary and capricious standard. 229 Md. App. at 558-59. We reach the same conclusion.

OJB contrasts the MPIA with the APA. While the MPIA does not expressly provide a standard by which judges should review challenges to agency action, the APA expressly provides for application of the arbitrary and capricious standard. *See* SG § 10-222(h)(3)(vii) ("In a proceeding under this section, the court may … reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision … is arbitrary or capricious."). According to OJB, an arbitrary and capricious standard makes sense for APA cases, because in those cases courts "are reviewing matters in the agencies' particular purviews, where 'the expertise of the agency in its own field of endeavor is entitled to judicial respect.'" (quoting *Montgomery v. Eastern Corr. Institution*, 377 Md. 615, 626 (2003)). However, OJB continues, agencies such as BPD generally do not have expertise in determining which factors are relevant to a public interest determination and in deciding how those factors should be balanced. Thus, OJB says, there is no reason to defer to an agency's discretionary

determinations of those matters in any particular case. In addition, OJB points to the MPIA's federal analog, the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), which expressly requires courts reviewing denials of fee waivers under FOIA to do so *de novo*. *See id.* § 552(a)(4)(A)(vii).

BPD responds that the General Assembly's failure to expressly provide a *de novo* standard for challenges to denials of fee waivers, despite Congress having done so in FOIA, is telling. BPD posits that the difference emanates from the fact that FOIA's fee waiver provision leaves much less to the discretion of custodians than does that of the MPIA. The FOIA provision states: "Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Thus, Congress has told federal agency custodians what standard to apply in deciding whether disclosure – and therefore, a fee waiver – would be in the public interest. In contrast, the MPIA provision tells custodians that they must consider unspecified "other relevant" factors in arriving at their determination whether waiver of fees would be in the public interest. BPD contends that, by leaving so much to the discretion of agency custodians, the General Assembly intended for review of denials of fee waivers to be reviewed under the arbitrary and capricious standard. As BPD observes, "the understood default standard for judicial review of discretionary administrative decisions" is the arbitrary and capricious standard. *See also Maryland Small MS4 Coalition v. Maryland Dep't of the Env't*, 479 Md. 1, 30 (2022)

("With respect to matters committed to agency discretion, a reviewing court applies the arbitrary and capricious standard of review, which is extremely deferential to the agency.") (cleaned up). BPD also asserts that

> when a custodian agency makes a fee waiver determination, the agency possesses multiple areas of unique expertise that justify the courts' deference. The agency is intimately familiar with the records themselves, how they are kept, what they contain, what types of redactions will be necessary, and the difficulty of those redactions. The agency knows what capacity it has for conducting such review and production, what other burdens its workforce faces, how many other requests it must process, and the budgetary and staffing needs that will play into whether and how quickly the request could be processed without additional resources. The agency also knows better than anyone else what other endeavors have been undertaken to achieve the same or similar goals, and therefore whether public expenditures are justified to pay for the production.

We agree with BPD. By vesting substantial discretion in agency custodians to determine whether a requested fee waiver is in the public interest, the General Assembly necessarily understood and intended that any judicial review of denials of fee waivers would be conducted under the arbitrary and capricious standard. In 1986, just five years after the General Assembly added the fee waiver provision to the MPIA, Congress amended FOIA to expressly require *de novo* review of federal agency denials of fee waiver requests. *See* The Freedom of Information Reform Act of 1986, § 1803, Pub. L. No. 99-570, 100 Stat. 3207-50. We find it significant that the General Assembly has not made a similar amendment to the MPIA's fee waiver provision in the 37 years that have passed since then.

In addition, as discussed above, the General Assembly has not provided for judicial review of fee waiver denials in the MPIA itself. It has only provided judicial review for denials of inspection of records. *See* GP § 4-362(a). OJB was able to obtain judicial review

46

of BPD's discretionary denial of its fee waiver request because its complaint concerning that denial was cognizable as a petition for writ of administrative mandamus. As discussed, a writ of administrative mandamus only lies where there is "both a lack of an available procedure for obtaining review *and an allegation that the action complained of is illegal, arbitrary, capricious or unreasonable.*" *ProVen Mgmt.*, 472 Md. at 669 n.9 (emphasis added). Maryland courts have "the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts[.]" *Heaps v. Cobb*, 185 Md. at 379. Maryland courts do not have the inherent power to conduct *de novo* review of discretionary administrative determinations. *Cf. Washington Suburban Sanitary Comm'n*, 443 Md. at 284 (observing that Article 8 of the Declaration of Rights – Maryland's separation of powers requirement – "prevents the courts from making *de novo* administrative decisions in cases in which some exercise of agency expertise or discretion may yet remain to be applied").[27]

---

[27] In arguing for a *de novo* standard of review, *Amici* Public Interest Organizations make a statutory interpretation argument based on GP § 4-362(e), which provides that "[w]henever the court orders the production of a public record or a copy, printout, or photograph of a public record that was withheld from the applicant and, *in addition*, finds that the custodian acted arbitrarily or capriciously in withholding the public record or the copy, printout, or photograph of the public record, the court shall send a certified copy of its finding to the appointing authority of the custodian." (Emphasis added). *Amici*'s point is that, if only arbitrary and capricious denials of inspection result in referrals for potential discipline, the General Assembly contemplates that a threshold determination whether a denial of inspection was erroneous will be conducted under a less deferential standard. From that premise, *Amici* argue: "If the question of whether records *are disclosable* under the PIA is not subject to arbitrary and capricious review, there is no conceivable basis that a decision to impose fees on public interest organizations should be." We express no opinion concerning *Amici*'s interpretation of GP § 4-362(e). Judicial review of OJB's complaint about the fee waiver denial did not proceed under § 4-362. But for the allegation that BPD's denial of the fee waiver was arbitrary and capricious, OJB's complaint would

47

In sum, in reviewing an agency's decision to deny a requested fee waiver under the MPIA, courts determine whether the official custodian's exercise of discretion under GP § 4-206(e) was arbitrary and capricious. We now apply that standard to BPD's denial of OJB's requested fee waiver.

2. BPD's Denial of OJB's Fee Waiver Was Arbitrary and Capricious.

The arbitrary and capricious standard is "highly contextual." *Maryland Small MS4 Coal.*, 479 Md. at 30. Generally,

> the question is whether the agency exercised its discretion unreasonably or without a rational basis. Under this standard, a reviewing court is not to substitute its own judgment for that of the agency and should affirm decisions of less than ideal clarity so long as the court can reasonably discern the agency's reasoning.

*Id.* (cleaned up). The reviewing "court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *Walker v. Department of Hous. & Cmty. Dev.*, 422 Md. 80, 107 (2011) (citation omitted).

The Appellate Court below relied on *Baltimore Action Legal Team*, 253 Md. App. at 360, in concluding that BPD's denial of the requested fee waiver was arbitrary and capricious. Given the similarities between *Baltimore Action Legal Team* and this case, we begin our analysis of whether BPD's denial in this case was arbitrary and capricious by discussing the Appellate Court's decision in *Baltimore Action Legal Team*.

---

not have been cognizable as seeking a writ of administrative mandamus and there would have been no basis for judicial review of the fee waiver denial at all.

*a. Baltimore Action Legal Team*

Between December 2019 and January 2020, BALT and OJB (collectively for purposes of that case, "BALT") submitted three MPIA requests to the SAO. BALT requested fee waivers with respect to two of the three submissions. One of the fee waiver requests was for costs associated with disclosing full investigatory files relating to "alleged criminal activity of officers of the Baltimore Police Department," including conduct involving the use of force, that were closed in 2019, as well as any such files that had been open for more than 16 months. In support of its request for a fee waiver, BALT cited its status as a non-profit organization and stated that the information it was seeking "was a matter of public concern and public safety." *Baltimore Action Legal Team*, 253 Md. App. at 373. The other MPIA request for which BALT sought a fee waiver was for criminal investigatory files relating to a specific Baltimore City police officer from 1992 to 2020. *Id.* at 373-74. BALT requested a waiver of the fees to produce those records based on its status as a public interest, tax-exempt organization. *Id.* at 371. The SAO denied both requested fee waivers, without providing any explanation to BALT.

BALT subsequently filed suit in the Circuit Court for Baltimore City. The circuit court held that the SAO's denials of BALT's fee waiver requests were not arbitrary and capricious. The circuit court based its conclusion on the absence of evidence in the record regarding BALT's inability to pay the fees, as well as any indication of how BALT would disseminate the requested information. *Id.* at 395. On appeal, the Appellate Court reversed the circuit court's determination, holding that the SAO's fee waiver denial was arbitrary and capricious.

49

The reasons the SAO asserted for its denial were: (1) the SAO believed that BALT could afford to pay for the requested records; (2) the SAO did not believe the records "would contribute significantly to the public's understanding of government operations, namely the operations of the State's Attorney"; and (3) the SAO did "not know how the fee waiver will benefit the public as the resources needed to respond to this request (438 hours) reduce the ability of the members of the State's Attorney to handle their primary job functions – the pursuit of justice and prosecution of crime in Baltimore City." *Id.* at 396.

Regarding the first waiver request – for production of investigatory files relating to allegations of criminal conduct – the Appellate Court rejected the SAO's assertion that these records were not "meaningfully informative about government operations." *Id.* at 398. The Appellate Court "fail[ed] to see how the records of the SAO's criminal investigations of City police officers do not impact or concern the SAO's operations. The records would surely contain some insight into the activities of City police officers and would indicate whether a certain officer's actions were proper." *Id.* at 399. Furthermore, the Appellate Court reasoned that the SAO had overlooked a factor that the Attorney General previously advised could be useful to justify a fee waiver as being in the public interest, namely, "whether disclosure of records will shed light on a 'public controversy about official actions,' or on 'an agency's performance of its public duties.'" *Id.* at 400 (quoting *Action Committee for Transit*, 229 Md. App. at 557 (in turn quoting 81 Opinions of the Attorney General 154, 3 (1996))). The Appellate Court stated:

> We find this inquiry particularly germane in the context of a request seeking criminal investigatory records of City police officers, including those concerning use of force. Considering the well-documented public

50

controversy surrounding use of force by City police officers, which was the motivation for BALT's requests, at least some consideration should have been given to whether disclosure of these records would inform the public about this subject.

*Id.* at 400. Because the Appellate Court rejected the SAO's proffered rationale and the SAO failed to consider any other relevant factor beyond the cost and burden to the SAO of fulfilling the request, the Appellate Court held that the SAO arbitrarily and capriciously denied the fee waiver. *Id.* at 401.

Regarding the second fee waiver request, relating to a specific police officer, the Appellate Court also concluded the SAO denied BALT's fee waiver arbitrarily and capriciously. The Appellate Court noted the lack of time and cost estimates associated with the second request in the record. Additionally, for the same reason articulated above, the Appellate Court rejected the notion that these records would not significantly contribute to the public understanding of the operations of the SAO. *Id.* at 401-02 ("[T]he records BALT requested would certainly shed light on the SAO's methods of investigation, how they focused their investigation and the outcome of the investigation."). Finally, the Appellate Court indicated it "might have found" a redundancy argument compelling but that this argument was not raised in the record. *Id.* at 402.

### b. BPD's Application of the Factors It Determined Were Relevant to the Public Interest Determination

Here, BPD put forward four rationales for the denial of OJB's requests: (1) the asserted public interest purpose was too vague and general; (2) the records were unlikely to contribute significantly to public understanding of government operations because they

would be either redundant or unclear; (3) OJB either did not prove its inability to pay or BPD determined OJB could afford to pay; and (4) the cost and burden of the request.

### i. *The Public Interest Purpose of OJB's Request Was Plainly Apparent.*

Initially, we reject BPD's argument that OJB's explanation of the public purpose was too "general" or "vague" for BPD to discern whether the public would benefit from disclosure of the records. In light of the public controversy concerning misconduct by BPD officers, the public interest purpose that would be served by disclosure of the closed use of force investigation files was plainly apparent.

BPD is aware of the Consent Decree's Monitoring Team's reports, given that BPD is actively working to modify procedures and policies to remedy some of the flaws identified by the Monitoring Team. BPD is aware that its internal investigations procedures have been extensively and repeatedly criticized as insufficient. BPD is aware that OJB sought files that documented how BPD was conducting its internal investigations for Level 1, Level 2, and Level 3 uses of force. It was therefore plainly apparent that disclosure of the records was intended to assist the public in examining BPD's compliance with its own internal investigatory policies. Similar to the Appellate Court in *Baltimore Action Legal Team*, we "fail to see how the records of [BPD's internal] investigations of City Police officers do not impact or concern [BPD's] operations. The records would surely contain insight into the activities of City police officers and would indicate whether a certain

officer's actions were proper[,]" 253 Md. App. at 399, and whether BPD's subsequent investigation of the use of force was proper.[28]

### ii. The Redundancy of OJB's Request and the Clarity of the Records

We agree with the Appellate Court in *Baltimore Action Legal Team* that the redundancy of an applicant's request compared with information that is already publicly available can be relevant to a public interest determination under GP § 4-206(e)(2)(ii). *See id.* at 402. However, we are unpersuaded by BPD's argument that the information OJB requested actually is redundant.

None of the sources that BPD has pointed to is equivalent to investigation files that specifically show how BPD investigated its officers' uses of force in particular cases. For example, BPD points to its published policies and procedures, such as Policy 710, which describes how SIRT investigations are supposed to proceed. Reviewing the actual files of Level 3 use of force investigations that were closed between July 1, 2018 and December

---

[28] Mr. Melancon also took issue with the fact that OJB "did not explain … how the disclosure would achieve its purpose." What BPD now describes as a "use analysis" is the type of "dissemination plan" analysis that, as the Appellate Court noted in *Baltimore Action Legal Team*, while arguably required under FOIA, is "not statutorily required under the MPIA." 253 Md. App. at 395. We do not doubt that an applicant's plan for how it will disseminate requested records can be a relevant factor in a public interest determination under GP § 4-206(e)(2)(ii). But where, as here, the applicant is making a request for records that, if disclosed, would plainly provide a public benefit, if the custodian considers a dissemination plan to be a relevant factor, the custodian should ask the applicant specifically to explain what its dissemination plan is. As discussed above, the successful operation of the MPIA depends on collaboration between applicants and custodians in such situations. The record reflects that OJB maintains a website that effectively disseminates information relating to allegations of police misconduct to the public. If BPD had asked OJB how it planned to disseminate the records of closed use of force investigations, we have no reason to doubt that OJB would have provided a substantive answer.

19, 2019, would give the public the opportunity to determine for itself whether BPD complied with Policy 710 in particular cases. The other sources to which Mr. Melancon and BPD's counsel in the circuit court pointed are also not sufficiently similar to specific investigation files to effectively make OJB's request redundant.[29] BPD's reliance on those sources as redundant of OJB's request was arbitrary and capricious.[30]

Similarly, we reject BPD's reliance on what it calls its "clarity analysis." BPD proffered that, in order to comply with statutory requirements, the investigation files would be so heavily redacted that the public would not be able to glean anything useful from them. We do not rule out that the possibility that clarity of records can be a relevant factor in a particular case. However, we are not satisfied that it was reasonable for BPD to rely on the purported lack of clarity of the use of force investigation files post-redaction. There is nothing in the record on this point except BPD's assertion that it would be too difficult for the public to understand the records with the expected redactions. We will not sustain an MPIA fee waiver denial based on mere conclusory statements.

---

[29] For example, Mr. Melancon also relied on the portion of BPD's webpage in which it explains its commitment to transparency. This laudable goal does not make OJB's requests for particular investigatory files redundant. Additionally, an explanation of BPD's Consent Decree with the Department of Justice states that the Consent Decree is a "federal court order that requires changes to [BPD] so it can police in a constitutional manner." *Consent Decree Basics*, BALT. POLICE DEP'T, available at https://perma.cc/F2ZM-9T7A. It does not provide investigatory records from July 1, 2018 to December 19, 2019, as OJB requested.

[30] Indeed, BPD's assertion that OJB's request was redundant because the information OJB sought was already available seems in tension with BPD's posture in the circuit court, where BPD accused OJB of engaging in a "fishing expedition." If the information OJB sought was already disclosed, it is not clear what BPD thought OJB was "fishing" for.

*iii. OJB's Ability to Pay the Fee*

BPD argues that OJB failed to demonstrate its inability to pay the $245,670 fee quoted by Ms. Harding and, in the alternative, BPD contends that it determined OJB could pay. We find these positions to be fundamentally at odds, as the former suggests there is a lack of information necessary to make a determination and the latter suggests there is enough information to make an affirmative determination that OJB can afford to pay the quoted fee. The MPIA imposes no affirmative burden on requestors to demonstrate their inability to pay unless they are indigent and submit an affidavit of indigency. GP § 4-206(e)(2)(i).[31] We thus review BPD's alternative claim that OJB affirmatively could afford to pay the fee.

BPD notes that OJB stated in its requests that it was willing to pay "reasonable copying costs." However, at the same time, OJB said that it was "a program of a non-profit organization," and that it had "been deemed a public interest organization, classified tax-exempt, not generating any beneficiary income." Further, OJB represented to BPD that its request "is not for commercial benefit as it is not made by for-profit news media."

Notably, Ms. Harding wrote to Mr. Zernhelt on April 8, 2020: "While I understand that [OJB] is a non-profit that desires all fees be waived, could you consider narrowing the scope of the request to minimize costs? That would certainly reduce the fee and the time it would take to get responsive records. If not, could you please articulate any other

---

[31] This is not to say that there may be no consequences to an applicant's failure to provide information about its ability to pay a fee if a custodian makes a reasonable request for such information.

reasonable factors that can help BPD in considering your request to waive all of these fees?" OJB reasonably could conclude from this exchange that BPD accepted its representation that it could not afford to pay more than $245,000 for the requested files. Nothing in the record prior to Ms. Harding's May 27 email reiterating that BPD denied the requested fee waiver provides any basis for BPD to conclude that OJB could afford to pay the full $245,670 fee.[32] OJB's stated willingness to pay "reasonable copying costs" before receiving the $245,670 quote is not an admission that it can afford to pay the full fee. In short, to the extent Mr. Melancon determined that OJB could pay the full quoted fee, that conclusion was arbitrary and capricious.

### iv. Cost of Compliance and Burden on BPD's Personnel

Finally, BPD acknowledged its consideration of the cost of compliance and the burden on its staff to produce all requested records. As discussed, BPD's cost estimates for production of all Level 1, 2, and 3 use of force files was over $245,000 dollars. Additionally, Mr. Melancon indicated that BPD was understaffed, although BPD is able to contract certain tasks to third-party vendors that may perform some of the necessary functions. Mr. Melancon stated that "BPD did consider the overall cost of production,

---

[32] On June 19, 2020, Fusion Partnerships ("Fusion") paid BPD more than $21,000 for the production of Level 3/SIRT files. Fusion is a non-profit organization that serves as a fiscal sponsor to smaller organizations, including OJB. *See* https://www.fusiongroup.org/index.php/about-us, available at https://perma.cc/KXX8-YEAE; *see also Baltimore Action Legal Team,* 253 Md. App. at 397 (stating that Fusion "earned over $6 million in revenues in 2018"). On remand, it would be reasonable for BPD to ask OJB to provide more information about its access to funds from Fusion and any other sources that bears on its ability to pay the full quoted fee for the closed investigation files.

budgetary constraints, and manpower shortages in the Public Integrity Bureau, but these consideration [sic] did not drive the decision."

It was appropriate for BPD to consider the monetary cost of compliance and the burden on its personnel to fulfill OJB's request as factors in the public interest determination. However, given BPD's erroneous application of the other factors upon which it relied – and its failure to consider other relevant factors, as discussed below – BPD's consideration of the cost of production and personnel shortages does not render its determination to deny the fee waiver reasonable. *See Burke*, 67 Md. App. at 157 (custodian arbitrarily and capriciously denied a fee waiver request when it considered no more than the expense to the custodian of locating and duplicating the documents, without attempting to minimize the expense).

      *c.  BPD Failed to Consider Whether Disclosure of the Records Would Shed Light on Matters of Public Controversy.*

In the circuit court, BPD contended that

> the Custodian reviewed Plaintiff's statements concerning [its] ability to pay and whether the disclosure "is likely to contribute significantly to public understanding of the operations and activities of the government" – the "*other factor*," and exercised his discretionary authority to deny the Plaintiff's fee waiver request.

(Emphasis added). BPD's reference to "the other factor" reflects that, to the extent BPD considered anything other than OJB's ability to pay and the cost to and burden on itself, it only considered whether disclosure was likely to contribute significantly to the public understanding of the operations and activities of government. Although, as discussed above, a custodian has discretion to determine which other factors are relevant to the public

57

interest determination, in this case BPD was required to consider two additional related factors: whether disclosure would shed light on a matter of public controversy and whether the complete denial of a waiver would exacerbate the public controversy.

As discussed above, in *Baltimore Action Legal Team*, the Appellate Court concluded that the SAO had erred by not considering "whether disclosure of records will shed light on a 'public controversy about official actions,' or on 'an agency's performance of its public duties.'" *Baltimore Action Legal Team*, 253 Md. App. at 399 (quoting *Action Committee for Transit*, 229 Md. App. at 400 (in turn quoting 81 Opinions of the Attorney General 154, 3 (1996))). The Appellate Court stated:

> We find this inquiry particularly germane in the context of a request seeking criminal investigatory records of City police officers, including those concerning use of force. Considering the well-documented public controversy surrounding use of force by City police officers, which was the motivation for BALT's requests, at least some consideration should have been given to whether disclosure of these records would inform the public about this subject.

*Id.* at 400.

We reach the same conclusion in this case. BPD's historic lack of transparency about police misconduct issues has played a part in generating the public controversy about officers' use of force. *See* Baltimore Sun Editorial, *Here's what transparency for Baltimore police discipline would mean*, BALT. SUN (Feb. 21, 2018), available at https://perma.cc/5YWJ-XR62 ("Public trust in the police is already diminished precisely because the profession has treated itself as unanswerable to the people it serves."); Justin Fenton, *'No heroes here': Exhaustive report lays out two decades of Baltimore Police and city failure that led to GTTF scandal*, BALT. SUN (Jan. 13, 2022), available at

https://perma.cc/J4UL-DWA7 ("Investigators conducted interviews with 145 people, including with every mayor, police commissioner and top prosecutor from the past 20 years, as well as a range of police officers, city officials and consultants who worked with the city, and combed through emails and internal records. Their report reaches the assessment that corruption has been prevalent for decades, allowed by a culture of dysfunction in the Police Department and City Hall."). BPD's assessment of whether it would be in the public interest to waive the fees for disclosure of the requested closed investigation files should have included consideration of whether the records would shed light on that controversy.

In addition, BPD should have considered whether imposing the full fee on OJB would exacerbate the public controversy surrounding BPD's use of force by contributing to an appearance of a lack of transparency. In *Action Committee for Transit*, the Appellate Court observed that the effect of denying a fee can also be considered as a relevant factor. There, the Appellate Court noted that the agency failed to consider whether imposing a fee and denying a waiver request would chill free speech by imposing fees on journalists in retaliation for their past criticisms of the agency. *Action Comm. for Transit*, 229 Md. App. at 562-63. Here, too, given that the public controversy stems in part from BPD's historical failures in investigating its officers' uses of force[33] and given past allegations that BPD

---

[33] *See* BALTIMORE CONSENT DECREE MONITORING TEAM, FOURTH SEMIANNUAL REPORT, at 11 (Jan. 21, 2020), available at https://perma.cc/4MDA-BZHK ("BPD has not yet begun to sustainably improve the quality of its misconduct investigations or its disciplinary system."); *id.* ("As for the Consent Decree's ultimate objective of improving the speed and quality of investigations and the integrity of disciplinary outcomes, there are still too many cases for too few investigators, serious allegations are not investigated

minimized and covered up officers' misconduct,[34] BPD should have considered whether a complete denial of a fee waiver would exacerbate the public controversy by furthering the perception that BPD has something to hide.

For all of the above reasons, we agree with the Appellate Court that BPD's decision to deny OJB's requested fee waiver was arbitrary and capricious.

## C. A Remand to BPD for Reconsideration of the Public Interest Determination Is the Proper Remedy.

Having concluded that BPD's denial of OJB's requested fee waiver was arbitrary and capricious, we now must consider the proper remedy. BPD argues that a remand is appropriate because its errors were procedural. OJB argues that any request for a remand has been forfeited, and even if it were not forfeited, that BPD's fee waiver denial was substantively defective, and a remand therefore would be an inappropriate "second bite at the apple." As such, OJB asks this Court to hold that BPD must waive all associated fees

---

promptly, supervisors do not timely review investigations, and data on outcomes is not yet properly collected or analyzed."); *id.* ("BPD has not yet begun implementing targeted measures for improving supervisory performance, beginning with revising core supervisory policies and furnishing supervisory training."); *id.* at 12 ("The upshot is that BPD is undoubtedly moving in the right direction, but all the work that is left to do makes it impossible at this point to determine when BPD will be able to achieve effective and substantial compliance….").

[34] *See, e.g.*, Rich Shapiro, *'If you snitch, your career is done': Former Baltimore cop says he was harassed, labeled a 'rat' after attempt to root out police brutality*, N.Y. DAILY NEWS (Jan. 14, 2015), available at https://perma.cc/7DMX-4J6B (presented as Exhibit 31 by OJB in the circuit court).

with the production of OJB's request for closed use of force investigation records. We agree with BPD that a remand is the appropriate remedy.[35]

First, we disagree with OJB that the issue of the proper remedy is not before us. BPD included a question concerning remand in its petition for *certiorari*, and we granted review on that question. In any event, we would exercise our discretion under Maryland Rule 8-131 to decide the proper remedy in this case, because this is the first time this Court has ruled that a custodian's denial of a fee waiver was arbitrary and capricious. Guidance concerning the proper remedy will be useful to litigants and Maryland courts.

Second, as discussed above, BPD did not consider all relevant factors in the course of exercising its discretion to determine whether a fee waiver in whole or in part would be in the public interest. This was a procedural defect in BPD's analysis. The circuit court found that BPD acted in good faith in the course of considering OJB's MPIA requests. In the absence of bad faith on the part of an agency decision maker or prejudice to OJB, the proper remedy for BPD's procedural defect is a remand to BPD for reconsideration of the public interest determination. *See Baltimore City Det. Ctr. v. Foy*, 461 Md. 627, 649 (2018). We do not perceive any prejudice to OJB if we remand to BPD for a proper exercise of its discretion under GP § 4-206(e). OJB was entitled to an exercise of discretion that was not arbitrary and capricious; it was not entitled *ex ante* to a particular outcome. We trust

---

[35] After concluding that BPD's denial of the fee waiver was arbitrary and capricious, the Appellate Court did not state whether it was ordering a remand or ordering BPD to grant the fee waiver. Accordingly, we shall affirm the Appellate Court's judgment in part. Our judgment additionally will direct the lower courts to take the necessary steps to effectuate a remand to BPD for reconsideration of the public interest determination under GP § 4-206(e)(2)(ii).

that, on remand, BPD will consider in good faith all relevant factors that go into the public interest determination, consistent with the guidance we have provided above. That is what OJB was, and is, entitled to under the MPIA. We also trust that both parties will proceed on remand in the spirit of collaboration upon which the MPIA depends for successful resolution of complicated requests for records that implicate competing interests.[36]

## IV

## Conclusion

For the purpose of acting on an applicant's request for a fee waiver under the MPIA, the Act vests official custodians with discretion to determine which factors are relevant to a public interest determination (in addition to the applicant's ability to pay and whether the public would benefit from disclosure of the requested records). The official custodian also

---

[36] If necessary, the parties may choose to seek assistance from the Ombudsman to facilitate mediative efforts. Within a reasonable time after the mandate is issued in this case, BPD should identify, and let OJB know of, the official custodian who has the authority to ascertain and weigh the relevant factors and make a final determination as to whether a fee waiver would be in the public interest. In addition, BPD should ask OJB for specific information if necessary to make its public interest determination, and OJB should provide answers to reasonable requests for specific information.

We do not suggest that, in response to every request to waive a fee under the MPIA, an agency custodian must request information from an applicant before making a public interest determination under GP § 4-206(e)(2)(ii). In many cases, the public interest determination likely will be relatively straightforward.

We expect that the parties will engage in collaborative efforts with new verve, given the importance of the public records at issue. Furthermore, we are sensitive to the MPIA's demands for expediency and understand the original request came nearly four years ago. We encourage the parties to act with all due haste to resolve any remaining disputes. In the end, if OJB's fee waiver request is denied or only partially granted, the official custodian should prepare a written explanation concerning the factors that were considered and how they were weighed, and the explanation should be provided to OJB.

has discretion to balance all relevant factors and determine whether it would be in the public interest to waive some, all, or none of the fees to comply with a public information request. After concluding that analysis, if the custodian determines that it would be in the public interest to grant a full or partial waiver of the fees, the custodian has no additional discretion to deny such a waiver.

A challenge to a custodian's denial of a requested fee waiver is reviewed under the arbitrary and capricious standard. In this case, BPD's denial of OJB's requested waiver was arbitrary and capricious. We order a remand to BPD for reconsideration of the public interest determination.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED IN PART; CASE REMANDED TO THE APPELLATE COURT WITH THE INSTRUCTION TO FURTHER REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THE APPELLATE COURT OF MARYLAND AND THIS COURT TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**